UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERARDO ROMAN VALENCIA ZAPATA, et al., | Case No. 25-cv-07492-RFL |
| Petitioners, | **ORDER GRANTING PRELIMINARY INJUNCTION** |
| v. | Re: Dkt. Nos. 4, 9 |
| POLLY KAISER, et al., | |
| Respondents. | |

## I.    INTRODUCTION

Petitioners Gerardo Roman Valencia Zapata, David Rafael Colon Solano, Keymaris Alvarez Miranda, and Gabriela Alondra Vargas Plasencia are four asylum seekers from Venezuela, Colombia, and Peru who separately fled to the United States between late 2023 and early 2024. Each of the Petitioners was briefly detained by immigration officials at the border after either presenting themselves for inspection or being apprehended. Each Petitioner was then released on their own recognizance after immigration officials determined that they posed little to no risk of flight or danger to the community. Since their release at the border, Petitioners applied for asylum, withholding of removal, and protection under the Convention Against Torture. According to Petitioners, they have no criminal history and complied with their Immigration and Customs Enforcement ("ICE") and immigration court obligations, and the government has presented no evidence to the contrary.

On September 4, 2025, after Petitioners appeared at the San Francisco Immigration Court for hearings in their respective cases, they were arrested by ICE agents and taken into custody. That same day, they filed a petition for a writ of habeas corpus and a motion for a temporary restraining order.  On September 5, 2025, the Court granted Petitioners' motion, issued the TRO, and ordered the government to show cause why a preliminary injunction should not issue.  For the reasons that follow, the Court now **GRANTS** the preliminary injunction, as modified.

## II.    STATUTORY BACKGROUND

"The detention and removal of inadmissible noncitizens in the United States is governed by a complex statutory framework."  *Salcedo Aceros v. Kaiser*, No. 25-cv-06924-EMC, 2025 WL 2637503, at *1 (N.D. Cal. Sept. 12, 2025).  That framework is described below.

### A.    Full Removal Proceedings vs. Expedited Removal Proceedings

Full removal proceedings under 8 U.S.C. § 1229a are "the standard mechanism for removing inadmissible noncitizens."  *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 WL 2494908, at *2 (D.D.C. Aug. 29, 2025); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020) ("The usual removal process involves an evidentiary hearing before an immigration judge, and at that hearing an alien may attempt to show that he or she should not be removed.").  These proceedings are initiated by serving the noncitizen with a Form I-862 "notice to appear" in immigration court.  8 U.S.C. § 1229(a)(1).

Full removal proceedings "take place before an [immigration judge ("IJ")], an employee of the Department of Justice (DOJ) who must be a licensed attorney and has a duty to develop the record in cases before them."  *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872 (JMC), 2025 WL 2192986, at *3 (D.D.C. Aug. 1, 2025) (citing 8 U.S.C. § 1229a(a)(1), (b)(1)). In full removal proceedings, noncitizens have rights to hire counsel, to a reasonable opportunity to examine evidence against them, to present evidence on their own behalf, and to cross-examine any government witnesses.  8 U.S.C. § 1229a(b)(4)(A)–(B).  "[D]ue to the built in procedures," full removal proceedings "typically take[] place over the course of multiple hearings," which "allows time for noncitizens to both gather evidence in support of petitions for relief available in

immigration court . . . and seek collateral relief from other components of [the Department of Homeland Security ("DHS")]." *Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *3. Either party can appeal the IJ's decision to the Board of Immigration Appeals ("BIA"), and if the BIA upholds a removal order, the noncitizen can appeal that decision to a United States court of appeals. 8 C.F.R. §§ 1240.15, 1003.1; 8 U.S.C. § 1252. In sum, full removal proceedings "take place over the course of several months." *Make the Rd.*, 2025 WL 2494908, at *3.

By contrast, expedited removal proceedings are a "more streamlined . . . form of proceeding applicable only to certain noncitizens," whereby removal orders are "usually issued within a few days, if not hours." *Id.* (citation omitted). In expedited removal proceedings, the initial fact finder is an immigration officer, not an IJ. 8 C.F.R. § 235.3(b)(2)(i). The immigration officer asks the noncitizen a series of questions regarding (1) their "identity, alienage, and inadmissibility," and (2) their "intention to apply for asylum" or potential fear of persecution, torture, or return to their country. *Id.* at § 235.3(b)(2)(i), (b)(4). During this questioning, noncitizens have no right to counsel. *Id.* at § 235.3(b)(2)(i). If the immigration officer determines that the noncitizen is inadmissible under section 1182(a)(6)(C) or 1182(a)(7), "the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

If the noncitizen claims that they intend to apply for asylum or that they fear persecution, additional procedures apply. In such cases, "the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30." 8 C.F.R. § 235.3(b)(4). "The point of this screening interview is to determine whether the [noncitizen] has a 'credible fear of persecution.'" *Thuraissigiam*, 591 U.S. at 109 (quoting 8 U.S.C. § 1225(b)(1)(B)(v)). If the officer finds that the noncitizen's fear of persecution is credible, they will receive "full consideration of the asylum and withholding of removal claim" in full removal proceedings or USCIS administrative asylum proceedings. 8 C.F.R. § 208.30(f). If the officer finds that the noncitizen's fear of persecution is

not credible, "the officer shall order the alien removed from the United States without further hearing or review."  8 U.S.C. § 1225(b)(1)(B)(iii)(I).  However, the noncitizen may appeal the decision to an IJ, who shall review the determination "as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination."  *Id*. at § 1225(b)(1)(B)(iii)(III).

### B.    Detention Under 8 U.S.C. § 1226

8 U.S.C. § 1226 "provides the general process for arresting and detaining aliens who are present in the United States and eligible for removal."  *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022).  The provision "distinguishes between two different categories" of noncitizens.  *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018).  Under section 1226(a), the "default rule," *id*., a noncitizen "may be arrested and detained" "[o]n a warrant issued by the Attorney General" so long as their removal proceedings are pending, 8 U.S.C. § 1226(a).  Detention pursuant to section 1226(a) is nonmandatory.  So long as the noncitizen was not charged with, arrested for, or convicted of certain criminal offenses enumerated in section 1226(c), the government has discretion to release them on "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or . . . conditional parole."  *Id*. at § 1226(a)(2)(A)–(B).

"Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention."  *Jennings*, 583 U.S. at 306 (citing 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)).  "If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk, the IJ will order his or her release."  *Salcedo Aceros*, 2025 WL 2637503, at *1 (citation omitted).  The noncitizen's bond or parole can be revoked at any time, even if the noncitizen was previously released; however, if an IJ has determined the noncitizen "should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance."  *Id*. (citing *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019); *Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021)).

Section 1226(c) "carves out a statutory category of aliens who may *not* be released" on bond or conditional parole. *Jennings*, 583 U.S. at 289. It provides that the "Attorney General shall take into custody any alien" who falls into one of the five enumerated categories involving criminal offenses and terrorist activities. 8 U.S.C. § 1226(c)(1). Detention for noncitizens falling into these categories is mandatory. The Attorney General may release a noncitizen subject to detention under section 1226(c) only if they decide that releasing the noncitizen is necessary for witness-protection purposes and that the noncitizen is not a danger to the community or a flight risk. *Id*. at § 1226(c)(4).

### C.    Detention Under 8 U.S.C. § 1225

8 U.S.C. § 1225 enumerates the procedures by which the government may mandatorily detain certain "applicants for admission." Under section 1225, an "applicant for admission" is a noncitizen "present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1). Section 1225(b)(1) authorizes expedited removal for certain "applicants for admission" in two categories.

The first category is noncitizens "arriving in the United States" who are determined by an immigration officer to be inadmissible due to misrepresentation or failure to meet documents requirements. *Id*. at § 1225(b)(1)(A)(i); *see also id*. at § 1182(a)(6)(C), (a)(7).

The second category is noncitizens who (a) are inadmissible due to misrepresentation or failure to meet documents requirements; (b) have not "been admitted or paroled into the United States"; (c) have not "affirmatively shown, to the satisfaction of an immigration officer, that [they have] been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (d) have been designated by the Attorney General for expedited removal. *Id*. at § 1225(b)(1)(A)(iii). With respect to the second category, "DHS's predecessor agency did not" initially "make any designation, thereby limiting expedited removal only to 'arriving aliens.'" *Make the Rd.*, 2025 WL 2494908, at *4 (citing Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10313

(Mar. 6, 1997)).  However, DHS has since issued designations; until January 2025, the only noncitizens eligible for expedited removal proceedings were (1) arriving aliens, (2) those who arrived by sea and who have been present for fewer than two years prior to the determination of inadmissibility, and (3) those apprehended within 100 air miles of any United States international land border who entered within fourteen days of their encounter.  *Id*. (citing Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924, 68924 (Nov. 13, 2002); Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877, 48879 (Aug. 11, 2004)).  In January 2025, the government issued a designation titled "Designating Aliens for Expedited Removal," authorizing DHS to "exercise the full scope of its statutory authority" to place noncitizens in expedited removal proceedings. Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139, 8139 (Jan. 24, 2025).  DHS therefore now asserts authority to place in expedited removal proceedings noncitizens who did not arrive by sea who are encountered anywhere in the United States and have been continuously present in the country for less than two years.  *See id*.

Both categories of noncitizens subject to section 1225(b)(1) are subject to mandatory detention "until certain proceedings have concluded."  *Jennings*, 583 U.S. at 297.

Noncitizens who are "seeking admission" and not covered by the expedited removal provisions in section 1225(b)(1) are subject to section 1225(b)(2).  *See id*. at 287.  This category would include, for example, noncitizens who are arriving in the United States, seeking admission, and are inadmissible for some reason other than misrepresentation or failure to meet documents requirements (such as those having certain types of criminal convictions or those who would pose a foreign policy risk or are associated with terrorists, the Communist party, or Nazi activity).  *See* 8 U.S.C. § 1182(a)(2)–(3).  Subject to limited exceptions, the section provides that such noncitizens "shall be detained" for full removal proceedings under section 1229a "if the examining immigration officer determines" that the noncitizen "is not clearly and beyond a doubt entitled to be admitted."  *Id*. at § 1225(b)(2)(A).  "In other words, noncitizens subject to

1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending."  *Salcedo Aceros*, 2025 WL 2737503, at *3.

    **D.**    **The Applicability of Sections 1225 and 1226, and the Government's Change in Position**

Until this year, DHS has applied section 1226(a) and its regime of discretionary release and review of detention "to the vast majority of noncitizens allegedly in this country without valid documentation"—a practice codified by regulation.  *Id*.  As early as 1997, in the regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the Immigration and Naturalization Service and the Executive Office for Immigration Review stated that "[d]espite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination."  Inspection and Expedited Removal of Aliens, 62 Fed. Reg. at 10323.  The government's briefing in this case acknowledges that its position historically was that section 1226(a) was "an available detention authority for aliens [present without being admitted or paroled] placed in full removal proceedings under § 1229a." (Dkt. No. 16 ("Opp.") at 12.)[1]

However, the government now disavows its prior position in light of subsequent "legal developments," including its 2025 designation "restor[ing] the scope of expedited removal to the fullest extent authorized by Congress," 90 Fed. Reg. at 8139.  (Opp. at 12.)  It contends that section 1225 is "the sole applicable detention authority for *all* applicants for admission" and asserts that all applicants for admission are "subject to the mandatory detention framework" of section 1225(b).  (Opp. at 12, 14.)

**III.**    **FACTUAL BACKGROUND**

Petitioners are four asylum seekers from Venezuela, Colombia, and Peru.  Each fled their home country and arrived in the United States in late 2023 or early 2024.  The following

---

[1] All citations to page numbers refer to ECF pagination.

information is set forth in Petitioners' declarations and is not rebutted by contrary evidence from Respondents.

Petitioner Gerardo Roman Valenica Zapata is thirty-seven years old and was born in Venezuela. (Dkt. No. 4-3 ("Maggin Declaration") at ¶ 6.) He came to the United States in December 2023, fleeing Venezuela after being attacked by an individual with connections to the Venezuelan government. (Dkt. No. 2 ("Pet.") at ¶ 51; Maggin Declaration at ¶ 6.) Petitioner David Rafael Colon Solano is twenty-six years old and was born in Colombia. (Maggin Declaration at ¶ 10.) Colon Solano came to the United States in November 2023, fleeing Colombia after a cartel killed his father and some of his siblings. (Pet. at ¶ 52; Maggin Declaration at ¶ 10.) Valencia Zapata and Colon Solano both presented themselves to immigration officials upon entry, and after the officials determined that they posed little, if any, risk of flight or danger to the community, they were then released into the community on their own recognizance to wait for their immigration court dates. (Pet. at ¶¶ 51–52; Maggin Declaration ¶¶ 6, 10.) Shortly after their releases, Valencia Zapata and Colon Solano were placed into full removal proceedings as "alien[s] present in the United States without admission or parole" and charged with removability under 8 U.S.C. § 1182(a)(6)(A)(i). (Dkt. No. 16-1 ("Razalan Declaration") at ¶ 5; Dkt. No. 16-2 at ¶ 5.) They subsequently filed timely I-589 applications for asylum. (Pet. at ¶¶ 51–52.)

Petitioner Keymaris Alvarez Miranda is forty-one years old and was born in Venezuela. (Maggin Declaration at ¶ 8.) Alvarez Miranda came to the United States from Venezuela in December 2023 after receiving threats connected to the Venezuelan government. (Pet. at ¶ 53; Maggin Declaration at ¶ 8.) Gabriela Alondra Vargas Plasencia, the final Petitioner, is twenty-two years old and was born in Peru. (Dkt. No. 4-2 ("Guzman Declaration") at ¶ 15.) She came to the United States from Peru in May 2024, fleeing attacks and death threats. (Pet. at ¶ 54; Guzman Declaration at ¶ 15.) Both Alvarez Miranda and Vargas Plasencia entered the United States without inspection, were apprehended by immigration officials at the border, and were released on their own recognizance to wait for their immigration court dates after a determination

that they posed little risk of flight or danger to the community.  (Pet. at ¶¶ 53–54; Guzman Declaration at ¶15; Maggin Declaration at ¶ 8.)  Shortly after their releases, Alvarez Miranda and Vargas Plasencia were also placed into full removal proceedings as "alien[s] present in the United States without admission or parole" and charged with removability under 8 U.S.C. § 1182(a)(6)(A)(i).  (Dkt. No. 16-3 at ¶ 5; Dkt. No. 16-4 at ¶ 5.)  They both timely applied for asylum.  (Pet. at ¶¶ 53–54.)

On September 4, 2025, Petitioners appeared in person at the San Francisco Immigration Court for master calendar hearings in their cases.  (*Id.* at ¶ 55.)  During each of Petitioners' separate hearings, a DHS attorney moved to dismiss their case for the purpose of placing them in expedited removal proceedings.  (*Id.* at ¶¶ 1, 55.)  The IJ deferred ruling on the motions to dismiss, instead giving each Petitioner thirty days to respond and resetting their hearings for October 2, 2025.  (*Id.* at ¶ 55; Guzman Declaration at ¶ 11.)  Petitioners' full removal proceedings are still pending.

However, upon leaving the courtroom, each Petitioner was arrested by ICE agents and taken into custody.  (Pet. at ¶1.)  Petitioners all represent that they were given no reasons or explanations for their re-detention, nor an opportunity to contest their re-detention before a neutral adjudicator before being taken into custody.  (*Id.* at ¶ 69.)  According to their petition, they have no criminal history and have complied with all the obligations imposed on them by ICE and the immigration court.  (*Id.* at ¶¶ 51–54.)  The government has not presented any argument or evidence to the contrary.

That same day, Petitioners filed their petition for a writ of habeas corpus and motion for a temporary restraining order.  (Dkt. Nos. 2, 4.)  On September 5, 2025, the Court issued the TRO and ordered the government to show cause why a preliminary injunction should not issue.  (Dkt. No. 9.)  The government filed its response on September 11, 2025.  (Dkt. No. 16.)  Petitioners filed their reply on September 16, 2025.  (Dkt. No. 18.)  A hearing was held on September 18, 2025, and the TRO was extended through October 2, 2025, at 9:00pm.

## IV.    LEGAL STANDARD

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The party seeking a preliminary injunction must establish (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest."  *Id.* at 20.  In cases where "the Government is the opposing party," the third and fourth factors "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011)).

## V.    DISCUSSION

Petitioners have shown that there are, at the very least, "serious questions" going to the merits of their claims, that they are likely to suffer irreparable harm in the absence of preliminary injunctive relief, and that the balance of hardships tips sharply in their favor.  *See id.* at 1291.  The Court therefore grants Petitioners' motion for a preliminary injunction as modified.[2]

### A.    Petitioners Have Raised Serious Questions Going to the Merits of Their Claims

"The first *Winter* factor, the likelihood of success on the merits, 'is a threshold inquiry and is the most important factor in any motion for preliminary injunction.'"  *Doe v. Becerra*, No.

---

[2] In a footnote in its opposition, the government suggests that Petitioners' joinder of four separate petitioners in a single habeas petition was improper.  (*See* Opp. at 13 n.6.)  "Arguments raised only in footnotes, or only on reply, are generally deemed waived."  *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014).  In any event, the appropriate remedy for improper joinder would be to sever each Petitioner's claims and require each Petitioner to proceed in a separate action, not to deny relief.  *See Acord v. California*, No. 17-cv-01089-MJS (HC), 2017 WL 4699835, at *1 (E.D. Cal. Oct. 19, 2017).  No motion to sever is before the Court.

25-cv-00647-DJC-DMC, 2025 WL 691664, at *3 (E.D. Cal. Mar. 3, 2025) (quoting *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023)).  Here, Petitioners have raised serious questions going to the merits of both their procedural due process and substantive due process claims.

### 1.  Procedural Due Process

Under the Due Process Clause of the Fifth Amendment to the United States Constitution, no person shall be "deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  That interest is particularly weighty when government detention is at issue. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  Being held in custody by the government at an earlier time does not eliminate one's liberty interest in remaining on release.  That is because, as courts have repeatedly recognized, conditional release from physical restraint gives rise to a protected liberty interest.  *See generally Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (finding a parolee had an interest in his continued liberty); *Young v. Harper*, 520 U.S. 143, 150–53 (1997) (applying *Morrissey* to pre-parole).  "[E]ven when an initial decision to detain or release an individual is discretionary, the government's subsequent release of the individual from custody creates 'an implicit promise' that the individual's liberty will be revoked only if they fail to abide by the conditions of their release."  *Calderon v. Kaiser*, No. 25-cv-06695-AMO, 2025 WL 2430609, at *2 (N.D. Cal. Aug. 22, 2025) (quoting *Morrissey*, 408 U.S. at 482).

These due process rights apply to noncitizens residing in the United States.  The Supreme Court has firmly established that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas*, 533 U.S. at 693; *see also Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (citation omitted)).  Indeed, once a noncitizen is present in the United States, they have a "weighty" liberty interest in remaining in the United States, as they stand to lose rights to "stay and live and work" in the country and "to rejoin [their] immediate family."

*Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (citation omitted).  This is true "regardless of how someone entered the country: '[O]nce passed through our gates, even illegally,' noncitizens 'may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.'"  *Make the Rd.*, 2025 WL 2494908, at *10 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).

Accordingly, as numerous courts have held, a noncitizen released from custody pending removal proceedings has a protected liberty interest in remaining out of custody.  *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022); *see also Jorge M.F. v. Wilkinson*, No. 21-cv-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. March 1, 2021) (holding that a Mexican citizen with pending removal proceedings who had been released on bond had "a substantial private interest in remaining on bond" (citation omitted)).

### a.    Applicability of *Mathews v. Eldridge*

After determining that due process applies, the outstanding question is "what process is due."  *Morrissey*, 408 U.S. at 481.  "The constitution typically 'requires some kind of a hearing *before* the State deprives a person of liberty or property,'" particularly because the loss of liberty "cannot be fully compensated after the fact."  *Salcedo Aceros*, 2025 WL 2637503, at *5 (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)).  When determining what procedures are required by due process, courts apply the three-part test of *Mathews v. Eldridge*, 424 U.S. 319 (1976).  Under *Mathews*, courts must consider three factors: (1) "the private interest" at stake; (2) "the risk of an erroneous deprivation" without additional procedures and "the probable value . . . of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens imposed by the additional procedures."  424 U.S. at 335.

The government argues that the *Mathews* test does not apply to Petitioners' detention, citing the Ninth Circuit's remark in *Rodriguez Diaz* that "the Supreme Court when confronted with constitutional challenges to immigration detention has not resolved them through express application of *Mathews*."  53 F.4th at 1206.  (Opp. at 17 & n.7.)  But, as *Rodriguez Diaz* went on

to observe, "when considering due process challenges to [immigration detention under] § 1226(a), other circuits (reaching conflicting outcomes) have applied the *Mathews* test." *Id.* And, as *Rodriguez Diaz* further noted, the Ninth Circuit itself has "applied *Mathews*" in addressing what IJs must consider when releasing noncitizens on bond. *Id.* (citing *Hernandez v. Sessions*, 872 F.3d 976, 993–95 (9th Cir. 2017)). The Ninth Circuit has also regularly "applied *Mathews* in due process challenges to removal proceedings." *See Pinchi v. Noem*, No. 25-cv-05632-PCP, 2025 WL 2084921, at *3 n.2 (N.D. Cal. July 24, 2025) (collecting cases).

The two Supreme Court cases on which the government relies are not to the contrary. (*See* Opp. at 17.) Neither case applied *Mathews* because neither involved an initial detention decision or a decision to re-detain someone, but instead involved the decision whether to consider a noncitizen for *release*. *See Zadvydas*, 533 U.S. at 701 (continuing detention beyond six months); *Demore v. Kim*, 538 U.S. 510, 531 (2003) (continuing detention of those with certain criminal convictions). Courts have regularly refused to apply *Mathews* to the question of whether someone should be released, as opposed to detained or re-detained. "[P]ut succinctly, revocation implicates a liberty interest that inheres in the Due Process Clause, and the denial of eligibility for [release] does not." *Pruitt v. Heimgartner*, 620 Fed. App'x. 653, 659 (10th Cir. 2015); *see also Jago v. Van Curen*, 454 U.S. 14, 17, 21 (1981) (discussing the liberty interests of a prisoner who expected to receive parole but was denied release, which were not cognizable). Here, by contrast, the government proposes detaining Petitioners, who have been living in the United States for years, and has taken the position that they would not be entitled to any kind of bond hearing, either beforehand or in the future. In that situation, Petitioners' liberty interest is profound, and *Mathews* applies.

The government also seizes on a series of Supreme Court decisions discussing due process rights regarding applications for admission. Petitioners are challenging their detentions, not the processes by which applications for admission are decided. As such, the cases limiting the due process rights of noncitizens to challenge how applications for admission are decided are inapplicable. *See, e.g.*, *Landon*, 459 U.S. at 32 ("[A]n alien *seeking initial admission* to the

United States requests a privilege and has no constitutional rights *regarding his application*, for the power to admit or exclude aliens is a sovereign prerogative." (emphasis added)); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("At the outset we wish to point out that an alien who *seeks admission* to this country *may not do so under any claim of right*." (emphasis added)); *see id*. at 544 ("Whatever the procedure authorized by Congress is, it is due process *as far as an alien denied entry is concerned*." (emphasis added)); *Thuraissigiam*, 591 U.S. at 140 ("[A]n alien in respondent's position, therefore, has only those rights *regarding admission* that Congress has provided by statute." (emphasis added)).  Petitioners, who have been present in the country for years, are neither seeking admission nor challenging an admission determination.  *Salcedo Aceros*, 2025 WL 2637503, at *6; *Aviles-Mena v. Kaiser*, No. 25-cv-06783-RFL, 2025 WL 2578215, at *4 (N.D. Cal. Sept. 5, 2025).

Petitioners therefore have due process rights applying to detention during their removal proceedings.  The extent of these rights turns on the application of the *Mathews* test.  All three of the *Mathews* factors indicate that Petitioners have a right to a pre-detention hearing before a neutral arbiter.

### b.    Private Interest

Petitioners gained a liberty interest in their continued freedom when DHS elected to release them on their own recognizance under section 1226(a), which implied a promise that they would not be re-detained so long as they abided by the terms of their release.  *See Salcedo Aceros*, 2025 WL 2637503, at *7.[3]  Under federal regulation, DHS's decisions to release Petitioners necessarily involved a determination that each Petitioner was not a danger to the community nor a flight risk.  *See* 8 C.F.R. § 1236.1(c)(8) ("Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that

---

[3] The government's representation that Petitioners were "released on recognizance due to detention capacity issues," (*e.g.*, Razalan Declaration at ¶ 5), does not alter this conclusion. *Cf. Young*, 520 U.S. at 147, 149, 152–53 (holding that a pre-parolee released to "reduce prison overcrowding" enjoys a protected liberty interest).

the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."). There is no indication that circumstances have since changed. Indeed, at the preliminary injunction hearing, the government admitted that it was unaware of any evidence that Petitioners currently are flight risks or pose a danger to the community. *See Pinchi*, 2025 WL 2084921, at *4 ("[Petitioner's] release from ICE custody after her initial apprehension reflected a determination by the government that she was neither a flight risk nor a danger to the community, and Ms. Garro Pinchi has a strong interest in remaining at liberty unless she no longer meets those criteria."). Having met the conditions imposed by the government upon their release, Petitioners have a liberty interest in their continued freedom.

The government argues that despite not originally being detained pursuant to section 1225, Petitioners are subject to that section, they have no right to a custody redetermination hearing, and their detention is mandatory and constitutionally unobjectionable. (Opp. at 16–17.) Crucial to this argument is the government's contention that because section 1225 applies to Petitioners, section 1226 does not. (*Id*. at 16–19.) The government also argues that applicants for admission like Petitioners who (1) were not admitted or paroled into the country and (2) are eligible for expedited removal proceedings lack a liberty interest justifying additional procedures beyond what is provided for in the relevant statutory provisions. (*Id*. at 17.) These arguments, however, do not undermine the conclusion that Petitioners have a liberty interest in remaining out of custody after previously having been released.

First, Petitioners are currently in, and always have been in, full removal proceedings under section 1229a. At the preliminary injunction hearing, the government confirmed that each of the Petitioners was provided a Notice to Appear on a Form I-862 with the boxed checked on that form for "You are an alien present in the United States who has not been admitted or paroled"; this initiated full removal proceedings against them. The government also confirmed at the hearing that each of the Petitioners was arrested on September 4 pursuant to a Form I-200 warrant under section 1226 and that on that form, the box was checked for "the pendency of

ongoing removal proceedings against the subject." And the government conceded, both in its briefing and at the hearing, that Petitioners' full removal proceedings under section 1229a are still pending, as the immigration court did not grant the government's motions to dismiss (which were raised for the purpose of initiating expedited removal proceedings). (*See id*. at 16.) Corroborating this fact, the deadline for Petitioners to respond to the motions to dismiss in writing and the new date of their hearings have not yet passed. Because Petitioners are currently in section 1229a proceedings, Petitioners cannot be simultaneously subjected to expedited removal proceedings under section 1225(b)(1), and section 1225(b)(1)(B)'s mandatory detention provisions do not currently apply to them.

But even if the immigration judge dismisses Petitioners' cases in their full removal proceedings, that alone would be insufficient to justify the government subjecting them to expedited removal proceedings. That is because, as the government conceded at the hearing, it has not made a formal determination that Petitioners are inadmissible under section 1182(a)(6)(C) or section 1182(a)(7) as required by section 1225(b)(1)(A)(i). And while the government asserted at the hearing that all four Petitioners are amenable to such determinations when their full removal proceedings are dismissed, it acknowledged that there is no information in the record before the Court to support the proposition that such determinations could be made.[4]

---

[4] Because Petitioners were released on their own recognizance after their initial detention at the border, they are also ineligible for expedited removal proceedings as they have been "paroled" within the meaning of section 1225(b)(1). *See Aviles-Mena*, 2025 WL 2578215, at *4; *see also Garcia v. Andrews*, No. 25-cv-01006 JLT SAB, 2025 WL 2420068, at *5 (E.D. Cal. Aug. 21, 2025) ("ICE may choose to release a person on parole. The decision is discretionary and is made on a case-by-case basis. An immigrant who has been detained at the border, may be paroled for humanitarian reasons or due to it providing a significant public benefit (8 U.S.C. § 1182(d)(5)(A)) or he may be conditionally released (8 U.S.C. § 1226(a)). These are distinct procedures. A person on conditional parole is usually released on their own recognizance subject to certain conditions such as reporting requirements."). At the hearing, the government, relying on the Ninth Circuit's decision in *Ortega-Cervantes v. Gonzalez*, 501 F.3d 1111 (9th Cir. 2007), argued that the phrase "paroled into the United States" in section 1225(b)(1)(A)(iii)(II) referred only to humanitarian parole under section 1182(d)(5)(A), not conditional parole under section 1226(a). The Court observes that this reflects a recent change in position on behalf of the government. *See Aviles-Mena*, 2025 WL 2578215, at *4 ("In briefing and at oral argument, the government took the position that parole under section 1182(d)(5)(A), pursuant to which Aviles-

Second, the government cannot switch tracks and subject Petitioners to mandatory detention under section 1225(b)(2) when the government has instead placed Petitioners in removal proceedings under section 1229a and released them on their own recognizance under section 1226(a). From the moment that Petitioners were provided with a Form I-862, the removal proceedings against them have always been under section 1229a. Before now, the government has never claimed that it subjected Petitioners to detention under section 1225(b).

Nor could it have. The government conceded at the hearing that each of the Petitioners was provided a Form I-200A stating that they were being "released on [their] own recognizance" under section 1226(a). The government's decision to release Petitioners for years following their initial detention at the border gave them a protected interest in their continued liberty. *Calderon*, 2025 WL 2430609, at *3; *Becerra*, 2025 WL 691664, at *5. The government cannot now about-face and extinguish these liberty interests by pursuing mandatory detention against Petitioners, particularly given that Petitioners' September 4 arrest was pursuant to a I-200 warrant under section 1226. *Ramirez Clavijo v. Kaiser*, No. 25-cv-06248-BLF, 2025 WL 2419263, at *4 (N.D. Cal. Aug. 21, 2025) ("Here, the record clearly shows that the Government has consistently treated Petitioner pursuant to the framework under § 1226(a), and that DHS most recently detained Petitioner on July 24, 2025, by a warrant pursuant to that statute."); *Lopez Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588, at *5 (S.D.N.Y. Aug. 13, 2025) ("The Court cannot credit Respondents' new position as to the basis for Mr. Lopez Benitez's detention, which was adopted post hoc and raised for the first time in this litigation."). Petitioners have always been, and continue to be, subject to section 1226(a), not section 1225.

---

Mena was released, is not within the meaning of 'paroled into the United States' as used in section 1225(b)(1). . . . Instead, according to the government at oral argument, that term refers only to 'conditional parole' of those who have been arrested in the country under 8 U.S.C. § 1226.") In any event, the plain text of the provision does not distinguish between humanitarian parole and conditional parole. Nor does the government provide any basis to conclude that the legislative history regarding adjustment of status that informed the Ninth Circuit's narrow interpretation of the phrase "paroled into the United States" in section 1255(a) should be applied to section 1225(b)(1). *See Ortega-Cervantes*, 501 F.3d at 1116–20.

Third, section 1225(b)(2) does not apply to noncitizens like Petitioners, who have been released by DHS on their own recognizance and have since been present in the country, because they are not "seeking admission" as required under that provision. District courts around the country have rejected the government's position that section 1225(b)(2) permits it to pursue mandatory detention against noncitizens who have not been lawfully admitted but have been present in the country for years. *See Salcedo Aceros*, 2025 WL 2637503, at *8 (collecting cases). This Court concurs in that analysis. The plain meaning of the term "seeking admission" does not refer to individuals who have been in the country for years. And the government's novel and counterintuitive definition conflicts with its own regulation implementing section 1225(b)(2), which "treats 'arriving alien' as roughly interchangeable with an 'applicant . . . seeking admission.'" *Martinez v. Hyde*, No. 25-11613-BEM, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025) (citing Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312). The most natural interpretation of the statutory scheme is that those arriving and seeking admission are subject to mandatory detention under section 1225, whereas those simply residing in the country after being deemed inadmissible are subject to the mostly discretionary detention scheme under section 1226. Indeed, that is exactly how the Supreme Court explained the statutory structure in *Jennings*: "In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." 583 U.S. at 289.

In support of their position, the government relies on a recent BIA decision, *In re Yajure Hurtado*, 29 I & N. Dec. 216 (BIA 2025), which held that all noncitizens who entered without being admitted remain perennially "seeking admission," even if they have been living in the United States for a matter of years. *Id*. at 220. In that opinion, the BIA rejected the argument that the noncitizen was not "seeking admission" under section 1225(b)(2) because he had been residing in the interior of the United States for nearly three years. *Id*. at 221.

However, not only does *Yajure Hurtado* merit little deference due to its inconsistency with earlier BIA decisions, but its reasoning is also at odds with the text of sections 1225 and 1226. *Salcedo Aceros*, 2025 WL 2637503, at *9–12. The BIA's reading of section 1225 treats the phrases "applicant for admission" and "seeking admission" as synonymous, which renders the phrase "seeking admission" in section 1225(b)(2) superfluous. *Id*. at *9. It would also render superfluous the recent Laken Riley Act amendments to section 1226(c). Those amendments applied mandatory detention to noncitizens who (1) are inadmissible because they are present without admission or parole, procured admission into the United States because of misrepresentation, or lacked proper documentation; and (2) have been charged with, convicted of, or arrested for certain enumerated crimes. But those noncitizens would have already been subjected to mandatory detention under section 1225(b)(2), according to *Yajure Hurtado*'s interpretation of section 1225. *Id*. at *10 (citing Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025)).

The BIA justified its strained interpretation of "seeking admission" on the principal basis that it was seeking to avoid rendering section 1225(b)(2) superfluous. *Yajure Hurtado*, 29 I & N. Dec. at 222. But nothing about Petitioners' interpretation renders section 1225(b)(2) superfluous. While section 1225(b)(1) would apply to arriving noncitizens who are inadmissible on grounds relating to misrepresentation or lack of proper documentation, section 1225(b)(2) would apply to arriving noncitizens who are inadmissible on one of the countless other grounds enumerated in section 1182, such as their criminal convictions or foreign policy concerns. *Salcedo Aceros*, 2025 WL 2637503, at *11. Those individuals would be subject to mandatory detention, though they would not be eligible for expedited removal.

The Court therefore concludes that Petitioners have a significant private interest in their continued liberty. The first *Mathews* factor favors Petitioners.

### c. Risk of Erroneous Deprivation

The second *Mathews* factor also weighs in favor of Petitioners. Civil immigration detention must be "nonpunitive in purpose" and bear a "reasonable relation" to the authorized

statutory purposes of preventing flight and danger to the community. *Zadvydas*, 533 U.S. at 690 (citation omitted). As described above, Petitioners were released on their own recognizance after their initial detention at the border. By releasing Petitioners, immigration officers necessarily determined that they were neither flight risks nor dangers to the community. And in the intervening years, there has been no indication that Petitioners have become flight risks or dangers to the community. Absent a pre-detention hearing in front of a neutral arbiter, the risk of erroneous deprivation is high given the possibility that Petitioners' re-detention will not be pursuant to a valid state interest. *See Aviles-Mena*, 2025 WL 2578215, at *5.

The government argues that even if section 1226(a) applies and Petitioners have a protected liberty interest in their continued freedom from detention, they would still not be entitled to a pre-deprivation hearing. It observes that section 1226(a) requires only a post-deprivation hearing, which can later be reviewed by an IJ, *see Rodriguez Diaz*, 53 F.4th at 1196, and that the Supreme Court has "long upheld the constitutionality of the basic process of immigration detention, (Opp. at 19 (citing, *inter alia*, *Reno v. Flores*, 507 U.S. 292, 309 (1993))).

Even though the statutory protections of section 1226(a) require only a prompt post-deprivation hearing, we conclude here that the high risk of erroneous deprivation in this case likely means that a pre-deprivation hearing is constitutionally necessary. The government's stated view is that noncitizens have no entitlement to a hearing under section 1225(b)(2), and it has asserted that IJs are bound under *Yajure Hurtado* to deny any bond hearing to Petitioners following their detention. The government has further asserted that Petitioners are subject to expedited removal, a conclusion that appears to be legally unsupported for the reasons identified above. Accordingly, there is a high probability that Petitioners will receive no bond hearing at all if they are re-detained. Moreover, even if Petitioners did receive a bond hearing after being detained for some period after their arrest, that period of detention will likely turn out to be unwarranted, since the government cannot identify any basis to conclude that Petitioners are now dangers to the community or flight risks. *See Pinchi*, 2025 WL 2084921, at *5 ("[T]here is a substantial risk not only that the period between [Petitioner's] arrest and any bond hearing will

have served no valid government purpose but also that she will continue to be detained without a bond hearing in the absence of any valid purpose.").

### d.    Government's Interest

Finally, the Court join others in this District in concluding that the government's interest in re-detaining Petitioners without a pre-detention hearing is low "because ICE previously made the determination to release [them], and there is no evidence in the record of any changed circumstances that might cause ICE to reconsider its parole determination." *Aviles-Mena*, 2025 WL 2578215, at *6.  Furthermore, "[i]n immigration court, custody hearings are routine and impose a 'minimal' cost." *Singh v. Andrews*, No. 25-cv-00801-KES-SKO (HC), 2025 WL 1918679, at *8 (E.D. Cal. July 11, 2025) (quoting *Becerra*, 2025 WL 691664, at *6).  This is especially true given that Petitioners do not have criminal records and have consistently appeared for their immigration proceedings.

Because all three *Mathews* factors favor Petitioners, we conclude that Petitioners have demonstrated, at the very least, a serious question going to the merits of their procedural due process claim.

### 2.    Substantive Due Process

Even if Petitioners did not demonstrate a serious question going to the merits of their procedural due process claim, they have done so with regard to their substantive due process claim.  As described above, freedom from government custody "lies at the heart of the liberty" protected by the Due Process Clause. *Zadvydas*, 533 U.S. at 690.  For that reason, nonpunitive government detention violates the Due Process Clause unless the detention is ordered "in certain special and narrow . . . circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* (citations omitted).  In the context of civil immigration detention, the two "regulatory goals" of the Immigration and Nationality Act provisions governing such detention—"ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community"—can provide such "special justification." *Id.* (citations omitted); *see also Pinchi*,

2025 WL 2084921, at *5 ("Civil immigration detention is permissible only to prevent flight or protect against danger to the community." (citing *Zadvydas*, 533 U.S. at 690)).  Although "[t]he government has legitimate interests in protecting the public and in ensuring that noncitizens in removal proceedings appear for hearings," "the government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions."  *Hernandez*, 872 F.3d at 990, 994.  Due process requires that "the nature and duration" of detention "bear some reasonable relation to the purpose for which the individual is" detained. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

Petitioners were released on their own recognizance after a finding that they were neither flight risks nor dangers to the community.  In other words, the justifications for civil immigration detention were not present in their case.  And they presently argue that they are neither dangers nor flight risks, as evidenced by the fact that they have no criminal record and are diligently pursuing their immigration cases.  (Dkt. No. 4 at 13.)  The government has made no argument to the contrary.  Indeed, the government admitted at the hearing that it was aware of no evidence suggesting that Petitioners posed a danger to the community or a flight risk.  It detained them, nonetheless.  In the absence of such evidence, subjecting Petitioners to civil immigration detention does not bear a reasonable relation to the statutory purposes motivating it.  Such detention would lack a valid basis and violate Petitioners' right to be free from impermissible government custody.  *See Zadvydas*, 533 U.S. at 690; *see also Gamez Lira v. Noem*, No. 25-cv-00855-WJ-KK, 2025 WL 2581710, at *2–3 (D.N.M. Sept. 5, 2025) (finding the noncitizen petitioner was likely to succeed on a substantive due process claim in connection with his immigration detention because the evidence showed he was not a flight risk).

*Demore v. Kim* is not to the contrary.  In *Demore*, the Supreme Court concluded that mandatory detention of noncitizens under section 1226(c) was constitutionally permissible even without individualized findings that they were dangers to the community or flight risks.  538 U.S. at 514–16.  The Court observed that "reasonable presumptions and generic rules" pertaining

to certain subclasses of noncitizens are not impermissible exercises of Congress's "traditional power to legislate with respect to aliens." *Id.* at 526 (citing *Reno*, 507 U.S. at 313). The Court relied on the fact that when Congress enacted section 1226(c), Congress had "before it evidence suggesting that permitting discretionary release . . . would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *See id.* at 528. Therefore, the Court concluded that mandatory detention during removal proceedings of a noncitizen subject to section 1226(c) was "constitutionally permissible." *Id.* at 530. In short, *Demore* concluded it was reasonable for Congress to have legislated with the presumption that noncitizens convicted of particular crimes would likely not show up for their immigration proceedings or would likely be dangers to the community. In so holding, *Demore* continued to treat a noncitizen's risk of flight and danger to the community as the key touchstones for the validity of civil immigration detention. *See id.* at 527 (requiring that the period of detention "bear[] a reasonable relation to the purpose for which the individual was committed" (citation omitted)).

Petitioners are not a part of the subclass of noncitizens at issue in *Demore*—noncitizens convicted of one of a specified set of crimes—who may reasonably be presumed to pose a risk of flight or a danger to the community. To the contrary, Petitioners have already been determined not to be dangerous to the community or flight risks by immigration officials at the time of their initial release, and the undisputed evidence is that they continue not to be such risks. As such, Petitioners have demonstrated at least a serious question as to whether their detention would violate their substantive due process rights by failing to serve any valid purpose.

**B.    Petitioners Are Likely to Suffer Irreparable Harm Absent Injunctive Relief**

Petitioners have demonstrated a likelihood of irreparable harm absent preliminary injunctive relief. The government has taken the position that in the absence of preliminary injunctive relief, it remains free to subject Petitioners to mandatory detention under section 1225(b)(2), a provision that is not applicable to them, and provide them with no additional process to challenge such detention. Petitioners could be detained without hearing until they are

determined to have a credible fear of persecution or are ultimately removed after litigating their full removal proceedings through appeals. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); *see also Jennings*, 583 U.S. at 301 ("[N]either [section 1225(b)(1) nor (b)(2)] can reasonably be read to limit detention to six months."). This demonstrates a sufficient likelihood of irreparable harm. *See Aviles-Mena*, 2025 WL 2578215, at *6; *Hernandez*, 872 F.3d at 994 ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012))).

### C.    The Balance of Hardships Tips Sharply in Petitioners' Favor

Lastly, the balance of the equities and the public interest, which merge in this case because the government is the opposing party, tips sharply in Petitioners' favor. Preventing the violation of constitutional rights serves the public interest. *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005); *see also Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (citation omitted)). Specifically, "the public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M.F.*, 2021 WL 783561, at *3 (cleaned up).

The only interest asserted by the government is in the "steady enforcement of its immigration laws." (Opp. at 20–21.) But the only potential injury that the government faces is a "short delay" in detaining Petitioners if it "ultimately demonstrates to a neutral decisionmaker" that their detention is necessary to prevent flight or danger to the community. *Salcedo Aceros*, 2025 WL 2637503, at *14. The government provides no explanation as to how holding a pre-detention bond hearing interferes with the enforcement of its immigration laws. For these reasons, the Court concludes that the balance of hardships tips sharply in Petitioners' favor.

Because "there is no realistic likelihood of harm to the [government] from enjoining [its] conduct," *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003), and the government has presented no specific evidence of the costs it would incur from holding a pre-deprivation hearing, no security is needed to ensure that the government will be reimbursed for "costs and

damages sustained by . . . hav[ing] been wrongfully enjoined or restrained." Fed. R. Civ. P.

65(c). The Court exercises its discretion under Rule 65(c) to dispense with the filing of bond.

*Jorgensen*, 320 F.3d at 919.

### D.    The Parameters of the Pre-Detention Hearing

Prior to being re-detained, Petitioners are entitled to a pre-detention hearing, during

which a neutral decisionmaker must consider whether Petitioners are either dangers to the

community or flight risks such that their physical custody is required. While Petitioners argue

that in these pre-detention hearings the government must prove that they are dangerous or flight

risks by clear and convincing evidence, the Court declines to impose that requirement on the

current record in light of *Rodriguez Diaz*.

Though the Ninth Circuit imposed a clear-and-convincing requirement in proceedings

under section 1226(c) involving prolonged detention of noncitizens with serious criminal

convictions, *see Singh v. Holder*, 638 F.3d 1196, 1205 (9th Cir. 2011), *Rodriguez Diaz*

concluded that the constitutionally required procedures for section 1226(c) do not impact the

constitutionally required procedures under section 1226(a), in part because section 1226(a)

involves various other statutory protections that are unavailable under section 1226(c).

*Rodriguez Diaz*, 53 F.4th at 1203. Analyzing the issue directly, *Rodriguez Diaz* concluded that a

clear-and-convincing standard was not constitutionally required in section 1226(a) proceedings,

absent an additional factual showing indicating that such a standard was required by the

particular circumstances of the case. *See id*. at 1213. The Ninth Circuit then denied rehearing *en

banc*. *Rodriguez Diaz v. Garland*, 83 F.4th 1177, 1178 (9th Cir. 2023).

To be sure, Petitioners' pre-detention hearings are not technically proceedings under

section 1226(a). However, the reason for requiring pre-detention hearings in this case mirrors

the reason for having section 1226(a) hearings: that is, Petitioners should be treated, and have

been treated, as individuals who are subject to discretionary, not mandatory, detention. On the

current record, Petitioners have therefore not shown that they are likely to succeed in their claim

that the procedures applicable in the section 1226(a) discretionary detention context would violate procedural due process.

## VI.    CONCLUSION

Petitioners have sufficiently demonstrated serious questions going to the merits of their procedural due process and substantive due process claims.  The balance of hardships tips sharply in their favor, as well as the *Winter* factors of likelihood of irreparable injury and the public interest.  For the foregoing reasons, **IT IS HEREBY ORDERED** that Petitioners' request for a preliminary injunction is **GRANTED**, as modified.  Respondents are **ENJOINED AND RESTRAINED** from re-detaining Petitioners in any form without notice and a pre-deprivation hearing before a neutral decisionmaker in which a determination is made that Petitioners are either dangers to the community or flight risks such that their physical custody is required.  In addition, Respondents are **ENJOINED** from removing Petitioners from this District or the United States, so as to preserve this Court's jurisdiction during the pendency of their habeas proceedings.[5]  This Order shall remain in effect until further order of the Court.


**IT IS SO ORDERED.**

Dated: September 26, 2025

RITA F. LIN
United States District Judge

---

[5] *Salcedo Aceros*, 2025 WL 2637503, at *14; *M.K. v. Joyce*, No. 25-cv-1935 (JMF), 2025 WL 750599, at *1 (S.D.N.Y. Mar. 10, 2025) ("To preserve the Court's jurisdiction pending a ruling on the petition, Petitioner shall not be removed from the United States unless and until the Court orders otherwise.").  Under the All Writs Act, the Court "may issue all writs necessary or appropriate in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).